FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FEB -9 AM 9:50

U.S. DISTRICT COURT
N.D. OF ALABAMA

DAVID PERRY,                          )
                                      )
        Plaintiff                     )
                                      )          CIVIL ACTION NO.
    vs.                               )
                                      )          CV-96-AR-2295-S
NEW WORLD COMMUNICATIONS OF           )
ALABAMA, INC.,                        )
                                      )
        Defendant                     )

*Cko*

**ENTERED**

FEB 9  1998

MEMORANDUM OPINION

Presently before the court is a motion by defendant, New
World Communications of Alabama, Inc.("New World"), for summary
judgment in this employment discrimination action brought by
plaintiff David Perry ("Perry"), who claims a violation by New
World of the Age Discrimination in Employment Act ("ADEA"), 29
U.S.C. § 621, *et seq.*  The court finds that summary judgment for
the defendant is appropriate because there is no genuine dispute
of material fact with respect to the claims Perry asserts.
"Despite a court's understandable and routine relûctance to
decide [an age discrimination] case on a Rule 56 motion, 'summary
judgments for defendants are not rare in employment
discrimination cases.'  Whether or not rarely used, Rule 56 is a
rule adopted for a reason." *Garner v. Runyon*, 769 F. Supp.  357,
359 - 60 (N.D. Ala. 1991) (citation omitted).

22

## I. FACTS

New World's predecessor, Argyle Communications, hired Perry, who was then fifty-seven years old, in January 1995, as managing editor of a Birmingham television station, WVTM. Perry Dep. at 29. As managing editor, Perry identified potential news stories, provided logistical support and assigned news stories to both reporters and photographers, and rewrote scripts. *Id.* at 28, 44 - 45. While he had worked in the field of television news for three years during the mid 1960's, Perry had never worked as a managing editor. *Id.* at 34 - 36, 143 - 45.

In April, New World purchased WVTM from Argyle and, in June, hired Connie Howard ("Howard") as the news director. Howard Dep. at 23 - 24, 26; Pl.'s Ex. #1. Howard, a black female who was forty years old, supervised the newsroom staff. Howard brought with her a desire to change the newsroom's "laissez fare 'We're number two and that's okay with everybody'" approach, to a "'We're going to be aggressive and proactive instead of reactive...'" approach to covering the news. Howard Dep. at 207 - 8. Howard testified that WVTM's ratings for its 10:00 p.m. newscast improved from number two to number one after she began working there. *Id.* at 211 - 12.

To facilitate this change, Howard created an organizational

2

chart and provided newsroom employees with a list outlining their respective job responsibilities. Howard Dep. at 30 - 31; Howard Dep. Ex. 2. There is nothing in the record to indicate whether an organizational chart existed prior to Howard's arrival. Her chart indicated that Perry directly supervised one employee: a desk assistant. Howard Dep. Ex. 2. Prior to Howard's arrival, Perry supervised "a couple of dozen" persons including the reporters and photographers. Perry Dep. at 63. Otherwise, his day-today duties did not change. *Id.* at 29.

Perry felt "uneasiness" or "uncertainty" regarding his duties as managing editor, and Howard expressed concerns about his job performance. *Id.* at 106; Perry Dep. Ex. 12. For a couple of days, WVTM sent Perry to a sister station in Atlanta to observe the newsroom operations there and more specifically to observe the work of the assignment editor.[1] Perry Dep. at 106, 42. WVTM also provided its employees with access to an outside media consultant with whom Perry spoke. Perry Dep. at 41, 108 - 9.

In Howard's opinion Perry's work performance never rose to an acceptable level. Indeed, she believed he was incompetent.

---

[1] New World contends and Perry does not dispute that his duties as "managing editor," were consistent with the duties of an "assignment editor."

3

Howard Dep. at 226 - 27.  Before she terminated Perry, Howard issued at least six memoranda regarding her dissatisfaction with his job performance.  In several of those memoranda, she described specific instances in which she believed Perry's job performance to have been sub-standard.  Perry testified that Howard once described him as having an "old fashioned approach" to covering a story.  Perry Dep. at 76.  Eventually Howard placed Perry on probation.  When his performance failed to improve, she terminated him.  Howard testified that there was no single incident which precipitated the final termination decision. Howard Dep. at 228 - 29.  She believed that Perry simply was not aggressive enough toward news coverage and had difficulty planning, communicating with the rest of the staff and keeping track of crews.  *Id.* at 228 - 29.

## II. SUMMARY JUDGMENT STANDARD

Under the Federal Rules of Civil Procedure, summary judgment is appropriate where "there is no genuine issue as to any material fact and...the moving party is entitled to a judgment as a matter of law."  F.R.Civ.P 56(c).

4

### III. ADEA PRIMA FACIE CASE

Perry can make out a prima facie case for age discrimination: (1) by producing direct evidence of discriminatory intent, (2) by meeting the McDonnell Douglass indirect evidence framework, or (3) by demonstrating a pattern of discrimination using statistical data. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

### IV. DIRECT EVIDENCE

If Perry produced direct evidence of discriminatory motive the burden then shifted to the defendant to prove by a preponderance of the evidence that it would have reached the same decision, even in the absence of a discriminatory motive. *See E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990).

> At the summary judgment stage, the employer can prevail on this issue only if the record evidence that its employment decision was not based on discrimination is so strong that a reasonable trier of fact must so conclude; in other words, there must be no genuine issue of fact but that the employer would have made the same employment decision even absent the discriminatory motive.

*Burns v. Gadsden State Community College*, 908 F.2d 1512, 1518 (11th Cir. 1990). Summary judgment for the employer in a true direct evidence case is extremely uncommon.[2]

---

[2] While an employer may be entitled to summary judgment on the issue of liability, a plaintiff may still obtain declaratory and injunctive relief,

"Direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Carter v. Three Springs Residential Treatment*, ___ F.3d. ___, No. 97-6256, 1998 WL 2459, at * 7 (11th Cir. Jan. 6, 1998) (citations omitted). The Eleventh Circuit has attempted to clarify this definition by explaining that direct evidence is "evidence, which if believed, proves the existence of the fact in issue <u>without inference or presumption</u>." *Id*. at 6. (citations omitted & emphasis supplied). Therefore, a sufficient nexus must exist between the allegedly discriminatory statement and the employment decision at issue. *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1394 n.7 (11th Cir. 1997). More specifically, any statements that plaintiff seeks to introduce as direct evidence must have been made in the context of the specific employment decision which forms the basis for the plaintiff's lawsuit. *E.E.O.C.*, 901 F.2d at 924. When a plaintiff cannot meet this nexus requirement any proffered statements are not considered direct evidence, but may be introduced as indirect evidence. *Burrell*, 125 F.3d at 1393.

---

along with attorney's fees, if an unlawful criterion played a motivating role in the challenged employment decision. *See* 42 U.S.C. § 2000e-5(g)(2)(B); *Venters v. City of Delphi*, 123 F.3d 956, 973 & n.7 (7th Cir. 1997).

An exception exists to the nexus requirement where the
discriminatory statements are "broad, derogatory statements" that
indicate a generalized discriminatory attitude, such as where a
decision maker indicates that he would not hire any black people
if he owned the company. *Burrell*, 125 F.3d at 1394 n.7 (citing
*E.E.O.C.*, 901 F.2d at 924). Such generalized statements need not
be made in the context of a specific employment decision in order
to constitute direct evidence and establish a prima facie case of
employment discrimination. *Burrell,* 125 F.3d at 1394 n.7.

Perry argues that he has produced direct evidence of
discriminatory motive and therefore the McDonnell Douglass
indirect evidence framework is not applicable. Specifically,
Perry asserts that Howard's statement regarding Perry's "old
fashioned approach" to covering a story constitutes direct
evidence. *See* Perry Dep. at 76. This statement coupled with
Howard's opinion that Perry was not aggressive enough and
Howard's insistence on an "aggressive" "new image" for WVTM
support application of the direct evidence paradigm, contends
Perry.

Perry's argument fails for several reasons. First, Howard's
statement is not direct evidence because an inference must be
drawn between her statement and discriminatory motive. Perry

7

admits that Howard made the "old fashioned approach" comment in response to his "coverage plans for a story." Perry Dep. at 76. Therefore, the fact finder would have to draw an inference that because Howard believed Perry covered one particular story using an "old fashioned approach," she also held discriminatory attitudes about older employees and that such attitudes influenced her decision to terminate Perry. A jury would also have to infer that the "old fashioned approach" statement was a direct reference to Perry's age. An "old fashioned approach" refers to a characteristic which may be associated with increasing age, but is not necessarily correlated with advancing age. *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004, 109 S. Ct. 782 (1989) (finding employer's statements that plaintiff was not aggressive or proactive enough did not constitute direct evidence) (citation omitted). "Direct evidence, by definition, is evidence that does not require such...inferential leap[s] between fact and conclusion." *Carter*, 1998 WL 2459, at * 7.

&

In addition, Howard's comment does not satisfy the nexus requirement. She did not make the comment in the context of her decision to terminate Perry. Finally, Howard's statement cannot constitute direct evidence because it is not a "generalized" discriminatory statement which would abrogate the nexus

8

requirement.  Consequently, Perry cannot use Howard's statements as direct evidence of discriminatory motive.

## V. INDIRECT EVIDENCE

Without direct evidence of discrimination, Perry must proceed, if at all, under the McDonnell Douglas indirect evidence framework by showing "that he (1) was a member of the protected age group, (2) was subject to adverse employment action, (3) was qualified to do the job, and (4) was replaced by a younger individual." *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 - 8 (11th Cir. 1997) (citations omitted).  If Perry is assumed to have made out a prima facie case under the McDonnell Douglass framework, then the burden of production (not the burden of persuasion) shifted to WVTM to come forward with a legitimate non-discriminatory reason for the adverse employment action.  *See Trotter v. Board of Trustees of University of Alabama*, 91 F.3d 1449, 1454 - 55 (11th Cir. 1996).  If WVTM suppled such a reason, the burden then shifted back to Perry to produce admissible evidence from which a jury might find that the employer's proffered reason is pretextual.  *See id*.

New World argues that summary judgment is appropriate because Perry's sub-standard job performance establishes that he was not qualified for the position as managing editor and

9

therefore his prima facie case fails.  In the alternative, New World raises Perry's sub-standard job performance as its legitimate non-discriminatory reason for his discharge.

"[C]oncerns about [an employee's] performance are more appropriately raised as part of the second and third steps of the McDonnell Douglas scheme." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 (11th Cir. 1993).

> Placing a plaintiff's 'qualifications' in issue at both the prima facie case and pretext stages of a termination case is an unnecessary redundancy.... Most courts have avoided the redundancy by either analyzing the issues of prima facie case and pretext in tandem or by assuming a prima facie case in order to found their decision solely on pretext.

*Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1506 & n.2 (5th Cir. 1988)(citations omitted) (cited with approval in *Clark*, 990 F.2d at 1227).  Accordingly, this court will assume Perry has made out a prima facie case and the court will examine New World's claims of inadequate performance as a part of the pretext analysis.[3]

New World relies upon Perry's unsatisfactory performance

---

[3]  The court assumes Perry is qualified for the position in question because there is no evidence that Perry suffers from diminished mental capacity or some other condition which would render him unfit to perform his duties.  *See Bienkowski*, 851 F.2d at 1506 n.3 (holding that a plaintiff can meet his prima facie case by showing that he has not lost his ability to perform his job due to mental infirmity or loss of license).

10

evaluation and numerous disciplinary letters to support its assertion that it terminated him for inadequate performance. *See* 29 U.S.C. § 623(f)(3) (it is not unlawful "to discharge or otherwise discipline an individual for good cause."). In response Perry produces evidence, in addition to the "old fashioned approach" comment, from which, he argues, a jury could find pretext.

## A. Performance Evaluations

### 1. Allegedly "Untruthful" Performance Evaluations

Perry contends that Howard's disciplinary letters were "untrue." Perry Br. at 28 - 29. Indeed, Perry argues that the performance letters were actually a "paper trail" created by Howard in order to mask her true goal: hiring younger employees as replacements for older employees in an effort to fit her "new imagine" of the station. *Id.* at 5.

Perry attempts to show pretext by explaining the untruthfulness of each of Howard's disciplinary letters. For example, Howard disciplined Perry for his decision to send only a photographer to a story on the Jefferson County school system's coaches' demands for higher salaries. Overhearing Perry indicate that there was no reason to send a reporter to cover the story, Howard exercised her authority, as news director, to send both a

11

reporter and a photographer.  Howard testified that she sent the
reporter because she wanted to be "safe not sorry" on such a "big
story."  Howard Dep. at 56 - 57.  "If your crew is down there and
Mr. Hammonds, [the school superintendent], or whoever your
subject is walks in, walks out, your reporter runs up, they ask
questions, sometimes your get a response.  You're safe.  You're
not sorry that you didn't have your people in place."  Id. at 61.
When asked what additional coverage WVTM was able to obtain by
sending both a reporter and a photographer, Howard first stated
that the reporter spoke with Hammonds, but she later admitted
that she was uncertain as to whether the station was able to
interview Hammonds.  Id. at 56, 60.  She was certain, however,
that WVTM was able to obtain an interview with someone at the
scene which the station used to create a "sound on tape," meaning
the voice of someone other than the reporter which airs during
the visual presentation.  Id. at 59 - 60, 62.


     Responding to Howard's disciplinary letter over the
incident, Perry wrote, "My plan seemed appropriate, in as much as
Dr. Hammonds was not available for an interview and the only
apparent opportunity was to obtain..." a written copy of
Hammond's response.  Pl.'s Ex. 10.  Similarly, Perry responded to
several of Howard's other disciplinary letters by explaining why
he did not agree with her assessment of his performance.  He also

refused to sign Howard's performance review in which she rated
him "unsatisfactory" in fourteen areas, "fair" in three areas,
"good" in only seven areas and "unsatisfactory" overall.   Perry
Dep. Ex. 30.   In his self evaluation, Perry rated himself
outstanding in all areas.   Perry Dep. Ex. 29.

       The problem with Perry's "pretext" evidence is that it does
not suggest an absence of good faith.   Where an employer proffers
poor performance as its legitimate non-discriminatory reason for
termination, the plaintiff must produce evidence that the
employer evaluated the plaintiff in bad faith.   *Avril v. Village
South*, 934 F. Supp. 412, 417 (S.D. Fla. 1996).   *See Moore v.
Sears, Roebuck and Co.*, 683 F.2d 1321, 1322 (11th Cir. 1982);
*Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir.
1991).

       Even assuming the truthfulness of Perry's self-appraisal, as
this court must do on a motion for summary judgment, an
employee's own determination that his performance was adequate is
not enough to create a genuine issue of fact.   *Young*, 840 F.2d at
830.   The Eleventh Circuit has held that the focus of the pretext
inquiry in poor performance cases is the <u>employer's belief</u>, <u>not
the employee's perceptions</u> of his performance.   *Holifield v.
Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997).   The employee's

perceptions regarding his job performance "may create a material dispute about the employee's ability <u>but do nothing to create a dispute about the employer's honesty</u>--<u>do nothing</u>, in other words, <u>to establish that the proffered reason is pretext for discrimination</u>." *Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845, 949 (7th Cir. 1992) (emphasis supplied). Because Perry offers only his rebuttal letters as evidence of his satisfactory performance, this court is unable to find any actual non-imagined evidence to indicate that Howard evaluated Perry in bad faith.

### 2. Subjective Performance Criteria

Perry also challenges the performance evaluation used by WVTM and Howard's disciplinary letters because they utilize subjective criteria. Perry reminds the court that subjective criteria are suspect "because they are ready conduits" to discrimination. Perry Br. at 26 n.3 (citations omitted). *See e.g., Roberts v. Houston County Bd. of Educ.*, 819 F. Supp. 1019, 1027 (M.D. Ala. 1993) ("[A] defendant who relies on subjective criteria will subject itself to close scrutiny.") (citations omitted).

The Eleventh Circuit has implicitly recognized the necessity of utilizing subjective criteria when evaluating the job performance of persons in professional and managerial

14

positions. *Wilkins v. University of Houston*, 654 F.2d 388, 401 (5th Cir. 1981),[4] *cert. denied and judgment vacated on other grounds*, *University of Houston v. Wilkins*, 459 U.S. 809, 103 S. Ct. 34 (1982); *Stone v. Galaxy Carpet Mills, Inc.*, 841 F. Supp. 1181, 1187 (N.D. Ga. 1993). "[U]nlike an industrial plant where more precise qualifications..." may be utilized, *Wilkins*, 654 F.2d at 400, an employer would have difficulty evaluating the performance of a television managing/assignment editor without relying largely, if not entirely, on subjective criteria. Moreover, the court notes that the performance evaluation Howard used contained two objective criteria: "accuracy" and "timeliness." Dep. Ex. 29, 30. Without some evidence that Howard evaluated Perry's performance in bad faith or that primarily objective criteria would have been appropriate, the subjective nature of the evaluations is not evidence of pretext.

### 3. Satisfactory Performance Prior to Howard's Arrival

Perry next argues that the disciplinary letters and the negative performance evaluation do, in fact, suggest bad faith because there is no evidence that he failed to adequately perform his job duties prior to Howard's arrival. While an abrupt and unexplained change from satisfactory to unsatisfactory

---

[4] The Eleventh Circuit has adopted as precedent all Fifth Circuit Court of Appeals cases decided prior to October 1, 1981. <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981).

performance ratings might constitute pretext under other circumstances, such as in a retaliation case, the facts here do not suggest that something is amiss. Perry admits that he felt some "uneasiness" or "uncertainty" regarding his duties as an managing editor and the facts show that Perry worked for the station only four months prior to Howard's arrival. Perry Dep. at 106. There is no evidence that the television station's former owners formally evaluated Perry's performance during that fourth month period. More importantly, Perry admits that Howard's goal, from the time she arrived, was for WVTM to present a "new image' (that is not the same thing as a "youthful image"). See Perry Br. at 1.

Given her new approach to covering the news, it is not unusual that the station's performance standards changed. "[A] change in supervision which brings about a more critical approach toward an employee's work which results in dissatisfaction with the work-product, is a legitimate reason for termination; as such, it does not constitute evidence of discrimination." Hamalainen v. Mister Grocer Corp., 735 F. Supp. 1025, 1028 (S.D. Fla. 1990). Indeed, Perry admits, that in Howard's effort to create WVTM's "new image," she criticized the work of "nearly everyone" in the news department. Perry Dep. at 46 - 47. Given these circumstances, it is not unusual that Howard would more

16

carefully scrutinize Perry's job performance.  Accordingly, none of Perry's performance evaluation evidence shows pretext.

## B. Disparate Treatment

Perry asserts that Howard treated him in a discriminatory manner when she disciplined him for an incident, but failed to discipline a younger employee, Melena Cunningham ("Cunningham"), for the same infraction.  On August 31, 1995, Howard issued a memo to all newsroom employees indicating that the newscast had aired the incorrect spelling of a person's name.  She indicated that she would not tolerate future spelling and factual mistakes and that any similar errors would henceforth result in a warning, then suspension without pay and ultimately termination.  Pl.'s Ex. 13.  On September 1, 1995, WVTM aired newscasts containing two factual errors.  First, the news script incorrectly referred to Linn Moore ("Moore") of the Jefferson County Sheriff's Department as Chief Deputy, rather than his proper title, Deputy Chief.  Howard initially disciplined Carol Guthrie ("Guthrie"), an associate producer, for this mistake.  When Guthrie explained that Perry had provided her with the information regarding Moore's proper tile, Howard also disciplined Perry, explaining that such mistakes threaten WVTM's credibility.  Perry Dep. at 55 - 56; Howard Dep. Ex. 12 - 13.  That same day, Perry claims Melena Cunningham, who is younger than Perry, made a factual

17

error without negative repercussions.    Cunningham incorrectly

described the Deputy Chief as "Captain" Moore.    Pl.'s Ex. 10;

Howard Dep 108 - 109.

While Howard's failure to discipline Cunningham might

provide evidence of pretext under other circumstances, Guthrie is

the more appropriate comparator given these facts.    Howard

disciplined both Perry and Guthrie, who is outside the protected

class, for the Deputy Chief mishap.    Perry Dep. at 55 - 56.

Although it appears that Howard was inconsistent in meting out

discipline, on at least one occasion, there is no evidence that

Howard disciplined older employees but disregarded the mistakes

made by younger employees.    For example, the evidence does not

suggest that Howard consistently disciplined all responsible

parties anytime an older person was involved in making a mistake,

but routinely failed to discipline anyone if only younger

employees were responsible for a mistake.

Finally, Perry claims that Howard took his laptop computer

and cellular telephone, therefore making it more difficult for

him to satisfactorily perform his job.    However, Perry does not

contradict Howard's claim that she collected all the employees'

company issued laptop computers and cellular telephones after

WVTM's general manager directed her to do so.    Howard Dep. at 151

18

- 57.  Consequently, there is no evidence that Howard treated Perry disparately.

## D. Inconsistent Representations Regarding Perry's Replacement.

Perry claims that New World has made inconsistent representations regarding the identity of his replacement and that such "inconsistencies, incoherences, or contradictions in the employers' story" are evidence of pretext.  Br. at 41 (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997), *cert. denied*, *Combs v. Meadowcraft Co.*, ___ U.S. ___, 118 S. Ct. 685 (1998)).  In late September 1995, Howard submitted a request for creation of a new position in the newsroom: <u>nighttime</u> assignment editor.  Pl.'s Ex. 25.  On that same day, Howard suggested appointing Vicki Porter ("Porter"), a former newsroom employee, to the job.  The job announcement which followed listed a college degree as a requirement for the position.  Pl.'s Ex. 25.  On October 10, 1995, Howard released a memorandum welcoming back to the newsroom Porter, a black female, who was then twenty-nine years of age and did not have a college degree.  Pl.'s Ex. 26 ¶1.  Porter had previously worked in the newsroom, then transferred to the production department and then transferred back to the newsroom to assume this newly created position.  Howard Dep. at 137 - 38.  Although she was scheduled to work in the evening, she was at the station during the day.  Perry Dep.

19

at 114.  Howard testified that Porter was at the station during
the day in order to learn the duties of an assignment editor.
Howard Dep. at 138 - 41.

On November 3, 1995, the day Howard terminated Perry, she
submitted a request to the personnel department for Perry's
replacement.  Howard suggested hiring Scott Flannigan, a white
male, who was twenty-seven years old.  The job announcement for
this assignment editor position no longer contained the college
degree requirement.  It instead listed "based on experience"
under the "required skills" column.  Pl.'s Ex. 30.  While Howard
interviewed candidates for this position, Porter assumed Perry's
former responsibilities as managing/assignment editor.  Howard
Dep. at 140 - 41.

Perry contends that WVTM misrepresented to the EEOC the
identity of his replacement.  Perry points to several documents
in support of this contention.  First he points to the EEOC right
to sue letter which indicates that a white male (Flannigan)
replaced Perry.  Pl.'s Ex. 42.  Because of this finding, Perry,
who had asserted both race and age claims in his EEOC charge,
dropped his race claim.  Perry next points to a list of
"Employees Hired Since April 1, 1995."  Pl.'s Ex. 28.  That list
indicates that Flannigan was indeed hired as an assignment

editor.  Then during discovery, WVTM indicated that Porter had
been "transferred" to the assignment editor position in response
to Perry's interrogatory regarding the identity of the person who
had been "hired" as his replacement.  Pl.'s Ex. 3.

Perry has failed to produce any evidence that WVTM
misrepresented the identity of his replacement, either during the
EEOC investigation or during discovery.  The conclusion reached
by the EEOC in no way proves that WVTM made any
misrepresentations to the EEOC.  In addition, there is nothing
inconsistent about WVTM's statement that it transferred Porter to
the assignment editor position and later hired Flannigan as an
assignment editor.  Even Perry admits that both employees
simultaneously worked as assignment editors.  Perry Br. at 41.
More importantly, both Porter and Flannigan are substantially
younger than Perry.  Thus, for purposes of Perry's remaining ADEA
claim, the identity of the replacement is irrelevant.

Finally, Perry contends that Howard's decision to hire
Porter is evidence of pretext because Porter did not possess the
requisite college degree.  Perry does not dispute, however, that
WVTM hired Porter before his termination.  In addition, the new
position continued after Perry's termination.  Thus there is no
evidence that Howard hired Porter for a phantom position, as a

21

ruse, and then eliminated the position after a discriminatory termination.  Consequently, WVTM's failure to enforce its job qualification restrictions bears no relationship to Perry's termination from a <u>different</u> position.  Such is particularly the case where WVTM later, for whatever reason, eliminated the college degree requirement in its next job announcement for an assignment editor.  Under these circumstances the court is not convinced that WVTM's failure to follow is minimum job qualifications standards is evidence of pretext.  *See Carter,* 1998 WL 2459, at *8 (holding that a failure to follow minimum qualification standards is evidence that such standards are not mandatory).

### VI. STATISTICAL EVIDENCE:
**Alleged Pattern Of Terminating Persons Within The Protected Class and Replacing Them With Younger Employees**

As a final argument, Perry asserts that Howard targeted employees within the protected group for termination.  Howard alone made the decision to terminate four employees, three of whom were within the protected class.  Howard also participated in the decision to terminate five additional employees.  Of the nine total employees, whose terminations were precipitated by some input from Howard, four were in the protected group.  These numbers do not suggest that Howard targeted older employees.

22

Perry asks this court to ignore the total number of
employees in whose terminations Howard participated.    Instead,
Perry urges the court to focus on the four persons whom Howard
alone decided to terminate because the other five employees were
not actually terminated.    Those other five employees maintained
employment contracts which WVTM choose not to renew.    Non-
renewals are not actually terminations in Perry's opinion.

Perry's argument is unpersuasive.    The court notes that all
nine of those terminated are no longer employees of WVTM due to
poor job performance.    There is no evidence that any of the nine
voluntarily severed their employment relationship with WVTM.
Accordingly, WVTM terminated all nine!    Moreover, even if the
court were to consider only those four terminations, where Howard
was the sole decision maker, a group consisting of four employees
is "too small to establish a statistically significant model of
discrimination."    *Carmichael v. Schindler Elevator Corp.*, No.
CIV.A.1:92CV2696-RLV, 1994 WL 447072, at *2 (N.D. Ga. March 28,
1994).    *See Forehand v. Florida State Hosp. at Chattahoochee*, 89
F.3d 1562, 1572 n.24 (11th Cir. 1996); *Carmichael v. Birmingham
Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984)(noting that
statistical data are relevant in an individual disparate
treatment case).

Perry points out that Howard was solely responsible for hiring twenty one employees, only one of whom was within the protected group.  Perry unconvincingly points to these "statistics" as evidence of pretext.  "It is not unusual that an elderly employee who is forced to leave his position will be replaced by a younger individual, regardless of the employer's motives for the termination."  *Moore v. Sears, Roebuck and Co.*, 464 F. Supp. 357, 364 n.9 (N.D. Ga. 1979).  Even more fatal to Perry's statistical argument is the absence information regarding the applicant pool.  Perry presents no evidence which would indicate how many, if any, of the applicants were within the protected group.  Without evidence that any of the applicants were within the protected group, such statistics are meaningless. *Stone*, 841 F. Supp. at 118.

## V. CONCLUSION

After careful thought, the court determines that Perry has produced no direct evidence of discriminatory motive and has produced only indirect evidence of pretext: the "old fashioned approach" comment.  Perry apparently had difficulty deciding whether he was targeted because of his race or because of his age.  A jury could not find discriminatory motive, based on age, solely from this comment.  Accordingly, WVTM's request for

24

summary judgment will be granted.

A separate and appropriate order will be entered.
DONE this 9th day of February, 1998.

_____
WILLIAM M. ACKER, JR.
.UNITED STATES DISTRICT JUDGE